OSCN Found Document:JC FAB, INC. v. STATE ex rel. OKLAHOMA EMPLOYMENT SECURITY COMMISSION

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 
 Court Dockets
 

 
 Legal Research

 
 Calendar

 
 Help
 
 





 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 JC FAB, INC. v. STATE ex rel. OKLAHOMA EMPLOYMENT SECURITY COMMISSION
2015 OK CIV APP 50
350 P.3d 181
Case Number: 112157
Decided: 04/27/2015
Mandate Issued: 05/20/2015
DIVISION IV
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION IV
Cite as: 2015 OK CIV APP 50, 350 P.3d 181

 

JC FAB, INC., Plaintiff/Appellee,
v.
STATE OF OKLAHOMA, ex 
rel. OKLAHOMA EMPLOYMENT SECURITY COMMISSION, Defendant/Appellant.

APPEAL FROM THE DISTRICT COURT OF
BRYAN COUNTY, OKLAHOMA
HONORABLE MARK R. CAMPBELL, TRIAL JUDGE

AFFIRMED

Thomas N. Marcum, BURRAGE LAW FIRM PLLC, Durant, Oklahoma, for 
Plaintiff/Appellee
Robert C. Newark, III, ASSISTANT GENERAL COUNSEL, OKLAHOMA 
EMPLOYMENT SECURITY COMMISSION, Oklahoma City, Oklahoma, for 
Defendant/Appellant


DEBORAH B. BARNES, JUDGE:
¶1 Defendant/Appellant State of Oklahoma, ex rel. Oklahoma Employment 
Security Commission (the Commission) appeals the district court's Order 
reversing the decision of the Commission's Assessment Board. The Assessment 
Board found Plaintiff/Appellee JC Fab, Inc. (JC Fab) is a successor employer of 
Texoma Waste Control (Texoma), and the district court reversed. Based on our 
review, we conclude the Assessment Board's determination that, under 40 O.S. 2011 § 3-111(A), JC Fab 
"continue[d] the operations" of Texoma "as a going business" is not supported by 
substantial evidence. Therefore, we affirm the district court's Order reversing 
the order of the Assessment Board.
BACKGROUND
¶2 JC Fab and Texoma entered into a "Commercial/Industrial Real Estate 
Purchase Contract" in May, 2011, in which they agreed that for $1.8 million, JC 
Fab would acquire the real property and certain personal property of Texoma. One 
year later, the Commission notified JC Fab, by letter, of its finding that "[JC 
Fab] has acquired substantially all of the organization, employees, trade, 
business or assets of Texoma . . . , and continued the operations of the 
predecessor as a going business." The Commission stated that "it has therefore 
been determined . . . that [JC Fab] is a successor to the account of the 
predecessor," and that JC Fab would, therefore, "acquire the merit rating 
account" of Texoma, including Texoma's "actual contribution and benefit 
experience, annual payrolls, and liability for current or delinquent 
contributions, interests and penalty."
¶3 The Commission's finding was made after a part-time employee of JC Fab 
submitted a form to the Commission entitled "Employer's Notice of Acquisition of 
Business." In this form, JC Fab appeared to represent it had "acquired 
substantially all of the trade, organization, employees, business or assets of 
[Texoma] . . . effecitive 8/12/11[,] and continued the operations of the 
predecessor as a going business." (Emphasis added.) However, after receiving the 
Commission's letter in May, 2012, JC Fab, by letter dated May 23, 2012, from its 
managing member, Scott Crain (Crain), "formerly disagree[d]" with the 
Commission's findings and requested a review and redetermination. Crain 
specifically stated in the May 2012 letter, in part, as follows: "I acquired 
[Texoma's] equipment and the real estate that [it] leased, to expand my existing 
business and not to continue [Texoma's] operation as a going business." Crain 
also stated in his May 2012 letter, as follows:

 
 I did hire [Texoma's] existing employees which totaled 14 persons, of 
 which only 5 remain. The other 9 left within the first few months of their 
 initial employment with [JC Fab]. We currently have approximately 80 
 employees. It does not seem equitable or fair that the merit rating of 5 
 former employees of [Texoma] should affect 80 employees of my 
 company.
¶4 By letter dated July 23, 2012, the Commission noted, among other things, 
that "[Texoma] produced waste containers as does [JC Fab]," and the Commission 
stated it had decided to uphold its previous determination that JC Fab was a 
successor. In response, JC Fab submitted a written protest and a request for a 
hearing before the Assessment Board.
¶5 A telephonic hearing was held before a hearing officer of the Assessment 
Board on September 7, 2012. At the hearing, Crain testified on behalf of JC Fab, 
and Theresa Capolino (Capolino), a compliance officer for the Commission, 
testified on behalf of the Commission. On the same date as the hearing, the 
Assessment Board entered its order finding JC Fab is a successor employer of 
Texoma under 40 O.S. 2011 § 
3-111(A). The Assessment Board noted that a successor employer, under § 
3-111(B), may request that only a portion of the experience rating of the 
previous employer be applied, but stated that JC Fab failed to make such a 
request within 120 days of the acquisition as required under § 3-111(B). That 
is, the Assessment Board stated: "Although the employer asserts that they make a 
different type of refuse container than the previous employer and that 
percentage of their sales is small, they did not request that consideration 
within the 120 days of acquisition . . . ." The Assessment Board found that 
because JC Fab "did continue to operate as a manufacturer of refuse containers, 
in addition to the other manufacturing products they produce, they did continue 
similar operations of the previous employer," and that JC Fab "is a successor 
employer."
¶6 JC Fab appealed the Assessment Board's order to the district court. The 
district court, in its Order filed in August, 2013, reversed the Assessment 
Board's order, noting that JC Fab "did not have a non-competition agreement with 
[Texoma]. This fact, combined with all of the other evidence, establishes . . . 
that [JC Fab] was not a successor to the business known as [Texoma]."
¶7 The Commission now appeals the district court's Order reversing the order 
of the Assessment Board.
STANDARD OF REVIEW
¶8 The Employment Security Act of 1980 sets forth the standard of judicial 
review in appeals of Assessment Board decisions as follows:

 
 In any judicial review under this part the findings of the Commission, or 
 its duly authorized representative, as to the facts, if supported by 
 evidence and in the absence of fraud, shall be conclusive, and the 
 jurisdiction of the court shall be confined to questions of 
 law.
40 O.S. 2011 § 3-404 (emphasis 
added).

 
 The Oklahoma Supreme Court has determined the phrase, "if supported by 
 evidence," as found in § 3-404, "means evidence which is substantial, that 
 is, affords a substantial basis in fact from which the fact in issue can be 
 reasonably inferred." Oklahoma Employment Sec. Comm'n v. Sanders, 1954 OK 155, 272 P.2d 379. The Court went on 
 to state it was Commission's function to weigh the evidence and make 
 findings, which findings must be accepted on judicial review if supported by 
 substantial evidence and not clearly erroneous.
Snider Bros. v. State ex rel. Okla. Employment Sec. Comm'n, 2008 OK CIV APP 80, ¶ 14, 194 P.3d 771.

 
 The words "if supported by evidence" mean substantial evidence. 
 [Sanders], 1954 OK 
 155, ¶¶ 8-9 . . . . Substantial evidence is "evidence . . . [that] 
 affords a substantial basis in fact from which the fact in issue can be 
 reasonably inferred" or "a reasonable mind might accept as adequate to 
 support a conclusion." Id.
Reliable Referring Serv., Inc. v. Assessment Bd., 2006 OK CIV APP 150, ¶ 6, 149 P.3d 1078. See also 
Dugger v. State ex rel. Okla. Tax Comm'n, 1992 OK 105, ¶ 9, 834 P.2d 964 ("The appellate courts 
will review the entire record made before an administrative agency acting in its 
adjudicatory capacity to determine whether the findings and conclusions set 
forth in the agency order are supported by substantial evidence," and "[a]n 
adjudicatory order will be affirmed on appeal if the record contains substantial 
evidence in support of the facts upon which the decision is based and the order 
is otherwise free of error.").
¶9 "The Commission, however, may not arbitrarily discredit and disregard 
unimpeached, competent and relevant testimony which is uncontradicted." 
Sanders, 1954 OK 155, ¶ 9. 
See also Wright & Edwards v. Okla. Employment Sec. Comm'n, 1997 OK 163, ¶ 24, 934 P.2d 1088 ("We stated, in 
[Sanders], that the function of the employment security commission is to 
weigh the evidence on matters properly before it and make findings thereon, and 
where such findings are supported by substantial evidence or are not clearly 
erroneous, they must be accepted, but that the Commission may not arbitrarily 
discredit and disregard unimpeached competent and relevant testimony that is 
uncontradicted.").
ANALYSIS
¶10 Title 40 O.S. 2011 § 
3-111(A)[1] 
provides, in part, as follows:

 
 Any employing unit, whether or not an employing unit at the time of the 
 acquisition, which acquires substantially all of the trade, organization, 
 employees, business, or assets of any employer (excepting in such 
 case any assets retained by that employer incident to the liquidation of the 
 employer's obligations) and who continues the operations of the 
 predecessor employer as a going business, shall be determined to be a 
 successor employer. The successor employer shall acquire the merit rating[2] account of 
 the predecessor employer, including the predecessor's actual contribution 
 and benefit experience, annual payrolls, and contribution rate. The 
 successor employer shall also become jointly and severally liable with the 
 predecessor employer for all current or delinquent contributions, interest, 
 penalties and fees owed to the [Commission] by the predecessor 
 employer.
(Emphasis added.) The dispositive issue presented on appeal is whether the 
Assessment Board's determination that JC Fab continued the operations of Texoma 
as a going business is supported by substantial evidence.
¶11 Regarding whether JC Fab continued the operations of Texoma as a going 
business, Crain testified at the Assessment Board hearing that, prior to the 
acquisition, JC Fab "built jacks and couplers for the gooseneck trailer 
industry. We built safe rooms, storm shelters. We did custom fabrication work 
for other manufacturers. We did a machine shop business. And we built oil field 
equipment, such as frac tanks and mud tanks." He also testified JC Fab had "a 
small line of open top refuse containers" prior to the acquisition. Crain 
testified that the production of refuse containers constituted "[l]ess than five 
percent, maybe one or two percent. It was a very small part of our business." He 
stated that as of the date of the hearing, and after the acquisition, the 
portion of JC Fab's business related to the production of refuse containers was 
"[p]robably less than five percent if - you know, two to three percent, 
probably." Crain stated that Texoma, on the other hand, "did 100 percent 
compactors," meaning Texoma only produced "hydraulically powered" waste 
compactors "used behind restaurants, department stores, anybody wanting to 
compact refuse for volume purposes."
¶12 Crain testified that JC Fab's sales in the past 12 months were 
"[p]robably right around, I think, seven or eight million," and that "[r]oughly, 
$100,000 to $200,000" of that was from the production of refuse containers. When 
questioned how much Texoma was generating from sales of refuse containers prior 
to the acquisition, Crain, who testified that Texoma had shown him their 
financial statements "[w]hen I was discussing buying their assets . . . to show 
how much equipment they had," stated that Texoma was "doing close to $2 million 
a year in sales" of refuse containers. The following exchange occurred between 
Crain and JC Fab's attorney:

 
 [Q] Do you have any reason to believe that, if you had purchased [Texoma] 
 and continued that operation, that you would have done anything different 
 than their $2 million?
 [A] I probably - if we would have taken over that part of the business, 
 it probably would have increased, but that wasn't our plan.
 The oil field work that we do and the work that we do for one of our 
 largest customers is Caterpillar, is what - that's more profitable, and 
 that's what our focus is. But we've chosen not to do [refuse 
compactors].
 We've turned down several opportunities to bid jobs that [Texoma] had 
 built products. And, because we don't have the time and we're - our backlog 
 is filled up. Our capacity is filled up doing oil field equipment work right 
 now.
¶13 Regarding sales of refuse compactors, Crain testified, "we have never got 
into that type of business," but admitted that after the acquisition, JC Fab

 
 continued [production of compactors] in a very small way. We don't do any 
 compactors on a continuous basis. But there's . . . two old [Texoma] 
 customers that, occasionally, will place orders. And we do it more as a 
 service to them. But we don't advertise it. We don't have a salesman out on 
 the road selling those. It's not part of our business plan, as a 
 whole.
Crain further testified that JC Fab kept, and did not change, the telephone 
and fax numbers at the facility acquired from Texoma, and that previous 
customers of Texoma would

 
 call in, periodically, asking us if we can build them a compactor or sell 
 them some parts . . . - and . . . I've lived in this community and worked in 
 it for over 40 years. And, you know, as a service to their older . . . 
 customers, we try to help them out.
 . . . . So, you know, we try to provide a service for them. But it's not 
 part of our business model.
Crain also responded in the negative when questioned, "Did you, on behalf of 
JC Fab, or any of your employees, to your knowledge, contact previous customers 
of [Texoma] to make sales?"
¶14 When questioned at the hearing, "If you weren't going to continue 
building the powered refuse containers that [Texoma] built, why did you buy 
their assets?" Crain responded,

 
 For their facility. The biggest and only reason that we bought [Texoma] 
 assets is because the year prior to that, we had got into building frac 
 paint (sic),[3] and our existing building that we were in was 
 too small. . . . And I needed some real estate and some buildings and 
 welding machines.
Crain stated that the acquisition occurred "to expand our frac paint (sic) 
business." He similarly testified that "we were using the new assets solely for 
the use of our existing business and to build the products that we were already 
currently building."
¶15 Crain further testified, consistent with the "Addendum to Purchase 
Contract" contained in the record, that there were a number of Texoma assets 
"that all had to do with [Texoma's] existing business" that JC Fab did not 
purchase, including "hoists," "tarpers and tarps," and "truck chassis." The 
following exchange occurred between Crain and JC Fab's attorney:

 
 [Q] If you had continued to make the products that [Texoma] made, would 
 you have had to have tarpers and tarps?
[A] Yes.
. . . .
 [Q] Okay. Would those truck chassis have been used in the refuse 
 container business that [Texoma] did?
[A] Yes.
[Q] And that's a 
 different business than JC Fab was involved in; is that correct?
[A] 
 Exactly.
Regarding the hoists that JC Fab did not purchase, Crain explained that JC 
Fab does not use them for "the frac tanks that we build . . . . We - our 
containers that we build are pulled by trucks. And these containers are pulled 
up onto trucks and dumped. So it's a totally different business model than JC 
Fab." When questioned whether, if JC Fab had continued producing the type of 
refuse containers that Texoma built, it would have purchased the hoists, Crain 
responded, "Yes. We would have needed these assets, but that wasn't, again, part 
of our business plan."
¶16 Crain explained that "[b]asically, everything we bought from [Texoma] [-] 
the real estate . . . and then the equipment . . . that we bought[,] . . . the 
welding machines, drill presses, press brakes . . . [-] were generic fabrication 
equipment, the same type of equipment that we already owned, but more of it. 
More welding machines, more press brakes. And then their facility." He further 
explained,

 
 I didn't buy anything related to, specifically, for what [Texoma was] 
 doing.
 The welding machines, and I think you can understand, like the equipment 
 I bought, like the welding machines weld the metal together, no matter what 
 shape it is. So I could use it in my business. The sheers or the pressed 
 brake cut metal and bend it. So it's very 
universal.
¶17 Crain testified that, prior to the acquisition, JC Fab had a building 
that was "[r]oughly, 16,000 square feet," and that through the acquisition "[w]e 
added 63,000 square feet." Crain testified:

 
 The whole point of buying this building and this equipment was to grow. 
 And, as we got into that building, we got - we've had large orders for frac 
 paints (sic) and oil field related stuff. We've hired new people. It was all 
 part of our move to buy that building and our 
expansion.
¶18 In addition, the following exchange occurred between Crain and JC Fab's 
attorney:

 
 [Q] At the time you acquired [Texoma] assets, how many employees did they 
 have?
[A] I'm going to - to the best of my knowledge, I think it was 15 
 to 16 employees.
[Q] Okay. Did you hire all of those employees to work at 
 JC Fab?
[A] We gave most of them an opportunity to come work for us when 
 [Texoma] shut down. And I think the majority of them did, initially. But 
 several of them quit right after for various reasons. But - and we're down 
 to just a few of them right now.
[Q] Could some of the reasons be that 
 you weren't building the products they were used to building?
[A] That's 
 exactly right. The products that we're building that are oil field related 
 and the stuff that we're doing for Caterpillar required extensively more 
 experience in welding, the type of welding procedures, and the work force at 
 [Texoma] was very nonskilled, seasonal-type workers. And, you know, they 
 weren't able to do the work that we needed. And most of them have moved on 
 and found other jobs.
¶19 Crain also testified that he "didn't require [Texoma] to sign a 
noncompete clause or prohibit them from going on and doing anything related to 
that business, because I wasn't getting into that business." He stated that 
Texoma could start up the same business they were running before the acquisition 
"and I wouldn't have a problem with it whatsoever. We wouldn't even be 
competing."
¶20 Crain's testimony was neither impeached nor contradicted at the hearing. 
The only witness who testified on behalf of the Commission at the hearing was 
its own employee, Capolino, who investigated the acquisition and made the 
initial determination that JC Fab was a successor of Texoma. However, Capolino 
testified that she determined JC Fab continued the operations of Texoma as a 
going business based merely on the fact that "[Texoma] produced refuse 
containers. And JC Fab also produces refuse containers." She similarly 
testified, "[JC Fab] still made some of the product that [Texoma] made."
¶21 On cross-examination, Capolino admitted that during her investigation, 
she did not determine, for example, what percentage of Texoma's business was the 
production of refuse containers; whether any of the Texoma owners, shareholders, 
or board members continued to be a part of JC Fab; or how much of JC Fab's 
business consisted of sales to Texoma account holders. She testified, "I made my 
determination [based] on the amount of assets that [JC Fab] acquired and the 
employees," and took "into consideration the fact that Texoma made refuse 
containers and the fact that JC Fab also made refuse containers." She stated, "I 
did not have a lot of information."
¶22 As quoted above, the Commission "may not arbitrarily discredit and 
disregard unimpeached, competent and relevant testimony which is 
uncontradicted." Sanders, 1954 
OK 155, ¶ 9. Here, Crain's testimony supports only one reasonable 
conclusion: that JC Fab did not "continue[] the operations of the predecessor 
employer as a going business[.]" Crain testified that JC Fab acquired Texoma's 
facility along with a substantial portion of its assets not in order to 
continue Texoma's $2 million per year refuse compactor business but, instead, to 
expand its own, distinct metalworking business, especially as it relates to the 
oil and gas industry. Crain did testify, as set forth above, that JC Fab's 
production of refuse containers increased after the acquisition from "maybe one 
or two percent" to "two to three percent, probably," and that "[r]oughly, 
$100,000 to $200,000" of its "seven or eight million" in sales over the past 12 
months before the hearing was from the production of refuse containers. However, 
Crain testified that this increase was the result of a de minimis "service" to 
two former Texoma customers; that it was not performed on a regular basis; that 
it was not advertised by JC Fab; that it was not part of JC Fab's business plan; 
that JC Fab did not, though it could have, continue to generate, or exceed, 
anywhere near the $2 million per year in sales of refuse compactors that Texoma 
generated before the acquisition; and that JC Fab did not acquire various assets 
of Texoma that would have been necessary to continue Texoma's refuse container 
sales as a going business. Moreover, Crain testified there was no noncompete 
clause with Texoma because JC Fab did not care if Texoma continued to 
manufacture its refuse containers as JC Fab was not in Texoma's product 
line.
¶23 In turn, the Commission did not assemble competent evidence to 
contradict, discredit, or impeach Crain's testimony. Instead, the Commission's 
only witness testified, in essence, that, from a certain remove, and absent "a 
lot of information," it appears JC Fab is a successor of Texoma and is 
continuing its operations as a going business. However, although this may have 
been a reasonable conclusion at the early stages of this case, the 
uncontradicted details elicited at the hearing reveal otherwise.[4]
¶24 We must conclude, with the district court, that the Assessment Board's 
determination is not supported by substantial evidence. In particular, the 
Assessment Board's determination that, under § 3-111(A), JC Fab "continue[d] the 
operations" of Texoma "as a going business" is not supported by substantial 
evidence. Consequently, we affirm the district court's reversal of the 
Assessment Board's order.
CONCLUSION
¶25 We conclude the Assessment Board's determination that, under 40 O.S. 2011 § 3-111(A), JC Fab 
"continue[d] the operations" of Texoma "as a going business" is not supported by 
substantial evidence. Therefore, we affirm the district court's Order reversing 
the order of the Assessment Board.

¶26 AFFIRMED.

RAPP, P.J., and THORNBRUGH, J., concur.

FOOTNOTES

[1] After 
the decision of the Assessment Board, and after the reversal of the Assessment 
Board's order by the district court in its Order filed in August, 2013, § 3-111 
was amended by laws effective November 1, 2013. However, we note that the 
language contained in § 3-111(A) was not changed in any manner significant to 
this appeal. But see n.2, infra.

[2] We note 
that the 2013 amendment to § 3-111 changed the phrase "merit rating" in this 
sentence to "experience rating."

[3] We note 
that although transcribed as "frac paint" in the hearing transcript, Crain was 
possibly referring, as he did earlier, and later, at the hearing, to "frac 
tanks."

[4] We note 
that the Assessment Board, in its order, also relies upon nonspecific facts, 
such as that JC Fab "did continue similar operations of the previous employer." 
The Assessment Board's order also appears to rely upon certain irrelevant 
findings, such as that JC Fab "kept the same location since they wished to 
purchase the property and facility from the previous employer," and that 
"[Crain] testified that the previous employer could 'conceivably' continue their 
business provided they only kept two welders and no presses to manufacture the 
refuse containers but did not sell the equipment specific to the compactor 
portion of the refuse container manufacturing." Immediately following recitation 
of this latter finding in its order, the Assessment Board concluded, "[JC Fab] 
is a successor employer."





 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Court of Civil Appeals Cases
 Cite
Name
Level

 2006 OK CIV APP 150, 149 P.3d 1078, RELIABLE REFERRING SERVICE, INC. v. ASSESSMENT BOARD
Discussed
 2008 OK CIV APP 80, 194 P.3d 771, SNIDER BROS., L.L.C. v. STATE ex rel. OKLAHOMA EMPLOYMENT SECURITY COMMISSION
Discussed
Oklahoma Supreme Court Cases
 Cite
Name
Level

 1992 OK 105, 834 P.2d 964, 63 OBJ 2135, Dugger v. State ex rel. Oklahoma Tax Com'n
Discussed
 1954 OK 155, 272 P.2d 379, OKLAHOMA EMPLOYMENT SECURITY COM'N v. SANDERS
Discussed at Length
 1997 OK 163, 934 P.2d 1088, 68 OBJ 915, WRIGHT & EDWARDS v. OKLAHOMA EMPLOYMENT SECURITY COMM.
Discussed
Title 40. Labor
 Cite
Name
Level

 40 O.S. 3-111, Successor and Predecessor Employers
Discussed at Length
 40 O.S. 3-404, Commission's Conclusions of Facts Conclusive
Cited